IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:23-CR-195 |
| | ) | |
| Plaintiff, | ) | JUDGE J. PHILIP CALABRESE |
| | ) | |
| v. | ) | |
| | ) | GOVERNMENT'S RESPONSE IN |
| MELVIN HODGE, | ) | OPPOSITION TO DEFENDANT'S |
| | ) | MOTION TO SUPPRESS (ECF 92) |
| Defendant. | ) | |
| | ) | |
| | ) | |

Now comes the United States of America, by and through its undersigned counsel,

hereby submitting this response in opposition to Defendant Melvin Hodge's Motion to Suppress.

(ECF 92). For the reasons discussed below, the Court should deny Hodge's motion.

The government is filing a separate response to Hodge's Motion to Suppress Cell

Site/Location Data. (ECF 90).

Respectfully submitted,

REBECCA C. LUTZKO
United States Attorney

By:  /s/ James P. Lewis
     James P. Lewis (MD: 1412170148)
     Assistant United States Attorney
     United States Court House
     801 West Superior Avenue, Suite 400
     Cleveland, OH 44113

(216) 622-3958
(216) 522-7499 (facsimile)
James.Lewis@usdoj.gov

## Contents

I.     SUMMARY OF INVESTIGATION INTO HODGE ........................................................6

     A.     AGENTS IDENTIFY SHERMAN THOMAS, AND ON SEPTEMBER 20, 2022, WATCH THOMAS RETRIEVE A UPS SHIPMENT CONTAINING MATERIALS USED TO MANUFACTURE ILLICIT PILLS. ...........................6

     B.     ON SEPTEMBER 28, 2022, AGENTS SEARCH THOMAS'S RESIDENCE AND STASH HOUSE, AND FIND METHAMPHETAMINE, MATERIALS USED TO MANUFACTURE ILLICIT METHAMPHETAMINE PILLS, AND MULIPLE CELL PHONES (INCLUDING A PHONE THOMAS USED TO ARRANGE DRUG MEETINGS WITH HODGE). ..............................................8

     C.     ON SEPTEMBER 19, 2022 (ONE DAY BEFORE THOMAS PICKED UP THE UPS SHIPMENT OF PILL COMPRESSION BINDER, AND NINE DAYS BEFORE THE SEARCH OF THOMAS'S RESIDENCE), AGENTS SEE THOMAS APPEAR TO MAKE A DRUG MONEY DROP IN HODGE'S FORD ESCAPE (WHICH WAS REGISTERED TO HODGE'S BRATENAHL KITCHEN BUSINESS) IN THE TOUCH OF ITALY PARKING LOT.  HODGE WAS IN THE VICINITY OF HIS OMEGA AVENUE BUSINESS UNIT BEFORE THAT SUSPECTED MONEY DROP, AND THEN DROVE TO HIS TIMBERLINE TRAIL RESIDENCE AFTER IT. .................................................9

     D.     FURTHER SURVEILLANCE OF HODGE IN OCTOBER AND NOVEMBER 2022 CORROBORATES THAT HIS TIMBERLINE TRAIL RESIDENCE AND OMEGA AVENUE BUSINESS UNIT ARE CONNECTED TO THIS DRUG CONSPIRACY. .................................................................................13

     E.     ON DECEMBER 1, 2022, AGENTS WATCH SOMEONE RETRIEVE A FEDEX PACKAGE CONTAINING TWO KILOGRAMS OF PILL COMPRESSION BINDER AND THEN DRIVE TO HODGE'S "BRATENAHL KITCHEN" BUSINESS ...................................................................17

     F.     HODGE'S MULTIPLE BUSINESSES AND VEHICLES CORROBORATE THAT HIS TIMBERLINE TRAIL RESIDENCE AND OMEGA AVENUE BUSINESS UNIT LIKELY CONTAINED EVIDENCE OF THIS ONGOING DRUG CONSPIRACY. .....................................................................19

     G.     THE ASSIGNED FEDERAL MAGISTRATE JUDGE AUTHORIZES THE SEARCH OF HODGE'S TIMBERLINE TRAIL RESIDENCE AND OMEGA AVENUE BUSINESS UNIT, AND AGENTS EXECUTE THE WARRANTS ON JANUARY 11, 2023...................................................................20

II.     ARGUMENT ................................................................................................21

A.    HODGE HAS FAILED TO ESTABLISH THAT HE HAD A LEGITIMATE EXPECTATION OF PRIVACY AT THE OMEGA AVENUE BUSINESS UNIT. ...................................................................................................22

B.    THE AFFIDAVIT ESTABLISHED PROBABLE CAUSE TO SEARCH HODGE'S TIMBERLINE TRAIL RESIDENCE AND OMEGA AVENUE BUSINESS UNIT FOR RECORDS AND SIMILAR ITEMS RELATED TO DRUG TRAFFICKING. ...................................................................................24

    1.    Legal Standard:  This Court must give "great deference" to the magistrate judge's probable cause finding, and only overturn that finding if the magistrate "arbitrarily exercised" their authority.....................................24

    2.    The Sixth Circuit's cases on nexus to a drug trafficker's residence. ........28

    3.    The affidavit established probable cause to search Hodge's Timberline Trail residence and Omega Avenue business unit. ..................................29

    4.    Hodge's arguments to the contrary about probable cause are meritless....34

C.    HODGE HAS FAILED TO MEET HIS "HEAVY BURDEN" FOR SHOWING THAT THE AFFIDAVIT CONTAINED ANY FALSE STATEMENTS THAT WOULD JUSTIFY A FRANKS HEARING. .......................................................39

    1.    Legal Standard:  Hodge bears a "heavy burden" to obtain a Franks hearing. ...............................................................................................39

    2.    The nine claims Hodge raises about the affidavit are not false or misleading. ...........................................................................................40

    a.    Claim 1:  Paragraph 13 of the affidavit (discussing the seizure of large quantities of multi-colored methamphetamine pills in July 2022) was referring to a different investigation, not this investigation into Hodge. ..41

    b.    Claim 2:  The reference to Sherman Thomas's two residences as "Target Locations 1 and 2" in Paragraph 29 was, at most, a typographical error copied from an earlier affidavit, which is clear when reading this affidavit in context...............................................................................................42

    c.    Claim 3:  The reference in Paragraph 95 to seven phone contacts between Hodge and L.D. on October 25, 2022 (the individual who gave $250,000 in drug cash to a DEA undercover agent that same day) is fully supported by subpoenaed toll records.......................................................................45

    d.    Claims 4 through 7:  Hodge has failed to show that any of the affidavit's factual statements about the September 19, 2022, suspected drug money transfer between Hodge and Thomas in the Touch of Italy parking lot were false or misleading..................................................................................47

4

e.      Claim 8:  Hodge cannot use a *Franks* hearing to address his claim about the unlawful use of cell site evidence, since that claim is *legal* in nature, and does not involve challenging the truth of any *factual* statements in the affidavit. ...............................................................................................53

f.      Claim 9:  Hodge has failed to meet his burden of showing that the affidavit omitted any information with the intent to mislead the magistrate judge. 53

D.      EVEN IF THIS COURT CONCLUDES THAT THE AFFIDAVIT WAS DEFICIENT, THE GOOD FAITH EXCEPTION TO THE EXCLUSIONARY RULE WOULD PRECLUDE THE SUPPRESSION OF EVIDENCE FOUND DURING THE WARRANTS. ...........................................................................55

III.    CONCLUSION .............................................................................................................57

I.      **SUMMARY OF INVESTIGATION INTO HODGE**

The affidavit describes in detail how Melvin Hodge participated in an ongoing conspiracy to traffic drugs, including illicit multi-colored methamphetamine pills, and why both Hodge's residence (804 Timberline Trail) and his business location (5450 Omega Avenue, Unit 4) were likely to contain records and other similar evidence. Below, the government summarizes the relevant facts from the master affidavit for those two locations.[1]

A.      **Agents identify Sherman Thomas, and on September 20, 2022, watch Thomas retrieve a UPS shipment containing materials used to manufacture illicit pills.**

Compression binder is a powder used to press pills. (Search Warrant Affidavit, ¶ 12). A punch die is used to stamp pills into a particular shape. (*Id.*). In conjunction with a pill press machine, these items are often used by drug traffickers who manufacture illicit pills containing methamphetamine or fentanyl. (*Id.*). The amount of compression binder and caffeine (another pill-making agent) in this case was enough to manufacture approximately 200,000 illicit pills. (*Id.*).

The investigation into Hodge's drug organization started in July 2022, when the DEA learned about a UPS shipment containing approximately 19 pounds of multi-colored pill compression binder and a punch die in the shape of a clover, addressed to 1524 Lakefront Avenue, Cleveland, Ohio. (*Id.*, ¶ 14-17). On July 12, 2022, codefendant Carvin Cook (who had a prior conviction for possessing and trafficking drugs) picked up that shipment from a UPS facility in Highland Heights, Ohio. (*Id.*). Agents thereafter obtained a federal "ping" warrant for

---

[1] Hodge submitted the master search warrant affidavit for 804 Timberline Trail and 5450 Omega Avenue under seal as Exhibit A to his motion to suppress at ECF 92. The government will therefore refer to the affidavit by paragraph numbers.

precise location information on Cook's phone. (*Id.*). Agents also learned that at around the same time Cook picked up that UPS shipment, his phone had a number of contacts with phone number 216-413-7116, which was later identified as codefendant Sherman Thomas's cell phone. (*Id.*, ¶ 20, 25). Thomas's -7116 cell phone was activated on July 11, 2022 (the day before Cook picked up the pill compression packages), and the first 12 calls Thomas's -7116 phone made were to Cook's phone, which indicated that Thomas was coordinating Cook's pickup of that UPS shipment. (*Id.*, ¶ 20-22).

In September 2022, the DEA received information about another UPS shipment containing kilogram-quantities of caffeine and multi-colored compression binder, this time addressed to 1641 Belmar Road in Cleveland. (*Id.*, ¶ 28). On September 20, 2022, agents conducted surveillance and saw Thomas pick up those UPS boxes from 1641 Belmar Road in Cleveland, then take them to 2140 Reyburn Road in Cleveland. (*Id.*, ¶ 29). Agents thereafter surveilled Thomas traveling back and forth between the suspected stash house at 2140 Reyburn Road and his apartment at 5900 Father Caruso Drive in Cleveland. *See* (*id.*).[2] Agents also

---

[2] Paragraph 29 of the affidavit contains a typographical error by referring to Thomas's two locations (5900 Father Caruso Drive and 2140 Reyburn Road) as "Target Locations 1 and 2." As discussed below, Paragraph 29 was copied from the earlier September 2022 affidavit to search 5900 Father Caruso Drive and 2140 Reyburn Road, which referred to those two places as "Target Locations 1 and 2."

When read in context, Paragraph 29 was referring to Thomas's two residences at 5900 Father Caruso Drive and 2140 Reyburn Road (which were searched as part of a separate federal warrant on September 28, 2022), not 804 Timberline Trail (Hodge's residence) and 5450 Omega Avenue (Hodge's business unit). Notably, even Hodge appears to agree that Paragraph 29 was talking about Thomas's two residences (5900 Father Caruso Drive and 2140 Reyburn Road), and that this paragraph had been copied from earlier affidavits in the case. *See* (ECF 92: Hodge Mot. to Supp., PageID 467-69).

obtained a federal warrant to place a GPS tracking device on Thomas's vehicle, a Nissan Kicks. *See* (*id.*, ¶ 45).

> **B.    On September 28, 2022, agents search Thomas's residence and stash house, and find methamphetamine, materials used to manufacture illicit methamphetamine pills, and muliple cell phones (including a phone Thomas used to arrange drug meetings with Hodge).**

On September 28, 2022, DEA agents executed federal search warrants at 5900 Father Caruso Drive (Thomas's apartment) and 2140 Reyburn Road (Thomas's suspected stash house). (*Id.*, ¶ 30-34).

At Thomas's Father Caruso Drive Apartment, agents seized "approximately 1 pound of suspected crystal methamphetamine located within a locked safe, approximately 4 kilograms of multicolored pills suspected to contain methamphetamine marked with a clover stamp located within a locked safe, a loaded handgun, a suspected narcotics ledger and numerous cellular telephones."  (*Id.*, ¶ 32).  Someone (believed to be Thomas) jumped out of the window of the Father Caruso Drive apartment and ran away before law enforcement searched it.  (*Id.*, ¶ 31).  At the search of 2140 Reyburn Road that same day, agents found "a pill press, a rifle, multiple kilograms of various colors of suspected compression binder (green, orange, red, purple, white), several blenders containing a white residue and other drug paraphernalia."  (*Id.*, ¶ 33).

The agents then obtained a follow-up federal warrant to search the cell phones seized from Thomas's Father Caruso Drive apartment.  (*Id.*, ¶ 34).  Upon reviewing Thomas's cell phones, the agents learned that one of his top callers was someone with phone number (602) 596-8899.  (*Id.*, ¶ 35-36).  When agents cross-referenced that -8899 number through the Ohio prison system, they found a recorded jail an inmate made to that number, in which the inmate referred to the user of the -8899 phone as "Melvin" (Hodge's first name).  (*Id.*, ¶ 36).  During that recorded jail call, "Melvin" told the inmate to call another phone number, which "Melvin"

provided as (216) 376-444 (last digit missing).  (*Id.*).  The jail call system then showed that the

inmate tried to call (216) 376-4445 two days later.  (*Id.*).  Agents also obtained a pen register for

the -8899 "Melvin" number through T-Mobile and WhatsApp, showing that the -8899 number

was "in frequent contact with [a Mexican phone number]."  (*Id.*, ¶ 38).  This was relevant

because Mexico is a source for methamphetamine smuggled into the United States.  (*Id.*).

The agents corroborated that the user of the -8899 number was Melvin Hodge because:

(a) the -8899 phone's WhatsApp account (used to communicate with a suspected drug supplier in

Mexico) contained a "unique identifier" for a Charter Communications account that was

subscribed to Sonya Williams at 804 Timberline Trail, Northfield, Ohio (Hodge's residence);

and (b) a response from Apple to a Section 2703(d) order stated that Hodge was associated with

that -8899 phone number.  (*Id.*, ¶ 40-41).  Agents also learned that Hodge had created an Ohio

LLC called "Bratenahl Mobile Kitchen."  (*Id.*).  When agents drove by Hodge's Timberline Trail

residence in August 2022, they saw a silver Ford Escape in the driveway that was registered to

his "Bratenahl Mobile Kitchen" business.  (*Id.*).  The agents also identified (216) 618-2000 as a

second phone number used by Hodge.  (*Id.*, ¶ 43).  Hodge's -2000 phone number was listed on

multiple airline reservations in his name, and was also subscribed to him.  (*Id.*).

**C.    On September 19, 2022 (one day before Thomas picked up the UPS shipment of pill compression binder, and nine days before the search of Thomas's residence), agents see Thomas appear to make a drug money drop in Hodge's Ford Escape (which was registered to Hodge's Bratenahl Kitchen business) in the Touch of Italy parking lot.  Hodge was in the vicinity of his Omega Avenue business unit before that suspected money drop, and then drove to his Timberline Trail residence after it.**

On September 18, 2022, at approximately 11:11 p.m. (two days before Thomas picked up

the pill compression / caffeine UPS shipment, as described above), agents noted three phone

"contacts" between one of the cell phones later seized from Sherman Thomas's apartment (314-

699-1761) and Hodge's -8899 number.[3]  (*Id.*, ¶ 44).  The GPS tracker on Thomas's Nissan Kicks showed that roughly an hour later, between approximately 12:22 a.m. and 12:46 a.m. on September 19, 2022, Thomas's vehicle "was in the vicinity of Rockside Road and Aurora Road in Bedford Heights, Ohio," and that Thomas then returned back to his Father Caruso Drive apartment at approximately 1:12 a.m.  (*Id.*, ¶ 45).  (Although not stated in the affidavit, the intersection of Rockside Road and Aurora Road is approximately a half-mile away from Hodge's business unit at 5450 Omega Avenue.).

Continuing on September 19, 2022, Thomas and Hodge had 21 phone contacts between 10:11 a.m. and 1:03 p.m.  (*Id.*, ¶ 46).  During that time, Hodge's phone was using a cell tower "in close vicinity" of his business unit at 5450 Omega Avenue.  (*Id.*, ¶ 47).  The GPS tracker on Thomas's Nissan Kicks then showed Thomas traveling to the Touch of Italy restaurant in Bedford Heights, arriving around 1:35 p.m.  (*Id.*, ¶ 49).  (Although not stated in the affidavit, Hodge's business unit at 5450 Omega Avenue is less than a mile away from the Touch of Italy Restaurant in Bedford Heights.).  At 1:35 p.m., just after Thomas arrived in the Touch of Italy Parking lot, he placed a call to Hodge.  (*Id.*, ¶ 50).

DEA agents established surveillance in the Touch of Italy parking lot and saw Thomas's Nissan Kicks parked next to Hodge's silver Ford Escape.  (*Id.*, ¶ 51).  At 1:43 p.m., Thomas entered the rear passenger door of Hodge's parked Ford Escape, then went to the driver's side door.  (*Id.*, ¶ 52).  Thomas had "two cellphones to his ears."  (*Id.*, ¶ 52).  At around that same time, phone records showed Thomas placing a call to Hodge.  (*Id.*, ¶ 52).  Roughly ten minutes later, the investigators saw Thomas enter Hodge's parked Ford Escape, "s[i]t inside the vehicle

---

[3] As explained later in this response, a phone contact can include a completed call, a missed call, or a text message.

for a few minutes," then get out of the Escape and return to his Nissan Kicks.  (*Id.*, ¶ 53).

Thomas left the parking lot and drove back to his Father Caruso Drive apartment at around 2:15

p.m., where he was seen "talking on a cell phone."  (*Id.*, ¶ 56).

 At approximately 2:14 p.m., Hodge came out of the Touch of Italy restaurant while

talking on his cell phone.  (*Id.*, ¶ 54).  Hodge "walk[ed] over to the Ford Escape and went into

the rear passenger area of the vehicle where [Thomas] was seen entering[.]"  (*Id.*, ¶ 54).  At 2:17

p.m., Hodge "g[ot] off the phone and walk[ed] back inside the restaurant."  (*Id.*, ¶ 57).  Hodge

eventually came back out of the restaurant at 3:17 p.m., got into his Ford Escape, and after

making a few stops, returned to his residence at 804 Timberline Trail in Northfield.  (*Id.*, ¶ 58-

62).

 When agents later reviewed the cell phones seized from Thomas's Father Caruso Drive

apartment on September 28, 2022, they found previous messages between Thomas and Hodge

corroborating that the two had a drug relationship, and that they used the Touch of Italy

restaurant as a meeting place for a previous drug money transfer.  (*Id.*, ¶ 64-66).  Specifically, the

agents found a November 2021 chat conversation in which Thomas asked Hodge about a "new

situation [supply of drugs]," and Hodge replied, "It's full right now [meaning Hodge had drugs

to supply Thomas]."  (*Id.*, ¶ 65).  Thomas said, "I want the rest of the old ones bro [meaning the

remainder of Hodge's previous drug supply]," and Hodge replied, "Meet at touch [of Italy] . . .

630/7?"  (*Id.*).  Hodge then said, "U bringing old back [meaning drugs that Thomas was unable

to sell]," and Thomas replied, "Naw I'm bringing the difference [meaning the drug money that

Thomas owed Hodge]."  (*Id.*).  The bracketed explanations are the beliefs of the affiant, who has

approximately 13 years of experience as a DEA agent, including Title III wiretaps investigations,

interpreting coded drug language, and investigating similar drug cases.  (*Id.*, ¶ 2-7, 13).

The agents also found a message conversation between Thomas and Hodge that took place between September 17, 2022 and September 22, 2022 (the timeframe of the September 19th meeting), in which the two discussed meeting ("Yo need to see you today"), talking to each other over Apple FaceTime ("FaceTime"), and a reference by Thomas to what the affiant believed to be pressed M30 fentanyl pills ("What you was asking about"). (*Id.*, ¶ 66). Just a few days later, on September 27, 2022, Thomas used his cell phone to search the internet "for the size of an 'm 30 pill' along with several searches for other pill press related parts." (*Id.*). Agents also found "stamps for a pharmaceutical 30mg Oxycodone pills" in the pill press seized from 2140 Reyburn Road on September 28, 2022. (*Id.*).

Based on all of that information, the affiant concluded that when Thomas went inside the rear door of Hodge's parked Ford Escape in the Touch of Italy parking lot on September 19, 2022, Thomas "place[d] narcotics proceeds into a hidden compartment or 'trap' in HODGE's vehicle for the crystal methamphetamine HODGE provided to THOMAS earlier in the day," and that "HODGE took the narcotics proceeds acquired from THOMAS on September 19, 2022 to [his residence at 804 Timberline Trail] based upon the surveillance as described above." (*Id.*, ¶ 63). This is consistent with the November 2021 text messages between Hodge and Thomas about meeting at Touch of Italy to exchange drug money. *See* (*id.*, ¶ 65). The affiant also noted that the September 19, 2022 Touch of Italy meeting occurred just one day before Thomas picked up the UPS packages containing kilogram-quantities of compression binder and caffeine, which further corroborated that Thomas had left drug cash in Hodge's Ford Escape as part of an ongoing drug conspiracy. *See* (*id.*).

### D.      Further surveillance of Hodge in October and November 2022 corroborates that his Timberline Trail residence and Omega Avenue business unit are connected to this drug conspiracy.

Paragraphs 67 through 112 of the affidavit describe surveillance that DEA agents conducted between October and November 2022, which corroborated that Hodge's Timberline Trail residence and Omega Avenue business unit were connected to Hodge's ongoing drug conspiracy.

On October 5, 2022, Hodge departed his Timberline Trail residence driving the silver Ford Escape (which was registered to his "Bratenahl Mobile Kitchen" business) and drove to 5450 Omega Avenue, Unit 4, in Bedford Heights.  (*Id.*, ¶ 67-70).  The DEA investigators conducted "an open source inquiry of [5450 Omega Avenue, Unit 4] and found it to be occupied by Bounce Mountain LLC, which appear[ed] to be a party supply rental company . . . registered to a male, Edward Mahone."  (*Id.*, ¶ 70).  When an agent tried to call the listed phone number for Bounce Mountain LLC, "an automated voice system indicated [the agent] had reached the reservations department for a hotel."  (*Id.*).  Further, the Bedford Heights building department "confirmed [5450 Omega Avenue, Unit 4] was registered to Bounce Mountain LLC with the last inspection being completed during the month of January 2013" (the search warrant was signed in January 2023).  (*Id.*).

During the October 5th surveillance of Hodge at 5450 Omega Avenue, Hodge approached one of the surveillance agents who was parked nearby at the corner of Omega Avenue and Aurora Road.  (*Id.*, ¶ 71).  Hodge told the undercover agent he was "very observant" and "asked if the investigator was a police officer."  (*Id.*).  A black Porsche sedan with heavy tint on the windows "remained with HODGE for the entirety of the encounter" with the undercover agent.  (*Id.*, ¶ 72).  Hodge and the black Porsche eventually left Omega Avenue "at a high rate of

speed" and pulled into the parking lot of the Touch of Italy restaurant.  (*Id.*, ¶ 73).  There, one of the surveillance agents saw the driver of the black Porsche "exit[] from his vehicle and beg[i]n staring at her undercover DEA vehicle, which was parked across the street."  (*Id.*, ¶ 74).  Roughly two weeks later, on October 20, 2022, the agents obtained federal search warrants to place a GPS tracker on Hodge's silver Ford Escape, and to renew the pings on Hodge's two cell phones for another 30-day period.  (*Id.*, ¶ 76-77).

On October 25, 2022, another group of DEA agents used an undercover agent to accept a $250,000 drop-off of "narcotics proceeds" from L.D. (name redacted here, consistent with how Hodge presented this information).  (*Id.*, ¶ 94).  According to those agents, L.D. was known to drive a black Land Rover with Ohio tag JTD1758.  (*Id.*).  Those DEA agents were unable to obtain a phone number for L.D., but "through open source records as well as corroboration through historical investigative information" identified L.D.'s phone number as 216-299-6130. (*Id.*, ¶ 95).  The pen register for Hodge's -2000 phone showed "approximately 7 contacts" with L.D.'s -6130 phone on the date of L.D.'s $250,000 drug money drop-off, (*id.*, ¶ 95), indicating that Hodge was involved in that transfer.

On November 7, 2022, agents used phone pings and GPS data from the tracker on Hodge's vehicle to locate his silver Ford Escape in the parking lot of a shopping plaza in Beachwood.  (*Id.*, ¶ 85).  At 2:45 p.m., Hodge's Ford Escape left the parking lot "followed by a black Porsche."  (*Id.*, ¶ 86).  Hodge's Ford Escape eventually drove to the area of St. Clair and East 74th Street in Cleveland for a short period of time, then turned around and got onto Interstate 90 heading west.  (*Id.*, ¶ 87-88).  "A few moments after [Hodge's] silver Ford Escape departed East 74th Street," an agent saw "a dark colored Land Rover circling the area of East 74th Street where the silver Ford Escape was located," and the dark Land Rover "departed just

14

moments after the silver Ford Escape." (*Id.*, ¶ 88). The agent was able to see a partial Ohio license plate on the dark Land Rover of "JTD1," (*id.*), which matched the first four digits of the license plate on L.D.'s black Land Rover, and further corroborated Hodge's involvement in the earlier $250,000 money transfer. The agents also noted the direction of travel Hodge's silver Ford Escape took during this surveillance was "a longer route in order to determine if anyone was following him," which was consistent with Hodge "conduct[ing] counter-surveillance." (*Id.*, ¶ 89).

Continuing on November 7, 2022, Hodge's Ford Escape drove to a parking lot on Woodrow Avenue in Bedford, arriving at 4:09 p.m. (*Id.* ¶ 90). Over 30 minutes later, at 4:43 p.m., an agent saw a black minivan park next to Hodge's Ford Escape. (*Id.*, ¶ 91). The agents saw Hodge and the driver of the minivan (an older male) "together outside the vehicle." (*Id.*). After a short time together, Hodge and the older male each went their separate ways. (*Id.*). The agents were able to identify the older male as S.S. (name redacted), who has a previous federal drug conviction. (*Id.*, ¶ 92).

Three days later, on November 10, 2022, ping information from both of Hodge's phones showed that he was in the vicinity of the Omega Avenue storage location. (*Id.*, ¶ 96-97). GPS information showed that his silver Ford Escape (which the agents believed had a "trap door" used to hide drugs and proceeds) was there too. (*Id.*, ¶ 97). Agents established surveillance and saw the silver Ford Escape backed up against the Omega Avenue building. (*Id.* ¶ 98). Hodge got out of the Escape and opened the front passenger door. (*Id.*). Hodge was on his cell phone and appeared to be waiting for someone. (*Id.*, ¶ 99). Approximately a minute later, a black Porsche Panamera (the same black Porsche that waited by Hodge on October 5, 2022, when he confronted an undercover DEA agent about being "police") pulled into the parking lot of 5450

15

Omega Avenue.  (*Id.*).  Hodge talked to the driver of the Porsche ("C.G.") in the parking lot while the bay door for Unit 4 was open.  (*Id.*, ¶ 101).  A food truck was parked inside.  (*Id.*). Roughly ten minutes later, Hodge returned to his silver Ford Escape, opened the driver's door, and retrieved a "small satchel."  (*Id.*, ¶ 102).  Hodge then closed the driver's door of his silver Ford Escape and opened the rear passenger door, though the agents were unable to see if Hodge placed or removed anything at this time.  (*Id.*).  Hodge and C.G. walked back toward C.G.'s Porsche, where C.G. "reach[ed] into the front passenger seat of the black Porsche from the drivers' side door and grab[bed] what appeared to be a manila colored envelope."  (*Id.*, ¶ 102-03).  Hodge and C.G. then got into a Ford Ranger pickup registered to "Around Your Way Towing and Transport LLC" (another business registered by Hodge, *see* (*id.*, ¶ 80)), and left. (*Id.*, ¶ 104-07).  Agents had previously seen this same Ford Ranger pickup parked at Hodge's residence.  (*Id.*, ¶ 104).[4]

Between November 11, 2022 and November 24, 2022, the GPS tracker on Hodge's silver Ford Escape showed that it remained at the Omega Avenue business unit.  (*Id.*, ¶ 108).  The affiant believed that the silver Ford Escape remained parked there because "HODGE detected members of law enforcement on November 10, 2022[,] and in order to thwart further surveillance efforts[,] stopped utilizing the vehicle."  (*Id.*, ¶ 111).  But on November 16, 2022, DEA agents saw Hodge and another male at the Omega Avenue business unit.  (*Id.*, ¶ 108).  At that time, "the silver Ford Escape was pulled into the garage of [Unit 4] and the garage door was then closed.  A few minutes later the garage door to [Unit 4] was opened and the silver Ford

---

[4] Paragraph 104 appears to contain a typo by referring to Hodge's residence (804 Timberline Trail) as "**Target Location 2**."  (*Id.*, ¶ 104).  Hodge does not appear to raise any issues about this typo.  *See* (ECF 92: Hodge Mot. to Supp.).

Escape was pulled back into the parking lot." (*Id.*).  The affiant later explained that this was consistent with drug activity because, based on the circumstances of the case, Hodge's silver Ford Escape likely had a "hidden compartment" Hodge used "to conceal narcotics as well as narcotics proceeds." (*Id.*, ¶ 149).

> ### E. On December 1, 2022, agents watch someone retrieve a FedEx package containing two kilograms of pill compression binder and then drive to Hodge's "Bratenahl Kitchen" business.

In November 2022, DEA agents learned about a package containing two kilograms of white FirmaPress (a pill binding material) that was addressed to an individual named S.H. (redacted) at 27300 Tremaine Drive, Apartment 1, in Euclid, Ohio. (*Id.*, ¶ 113).  This compression binder package was scheduled for delivery on December 1, 2022. (*Id.*).  Records showed that S.H. had placed four previous identical orders for two kilograms of white FirmaPress in March, May, July, and September of 2022. (*Id.*, ¶ 114).

On December 1, 2022, DEA agents conducted surveillance at the Tremaine Drive delivery address and saw a white van outside. (*Id.*, ¶ 116-23).  At approximately 12:26 p.m., a male got out of the driver's seat of the white van, went inside the apartment building, then came back out less than a minute later. (*Id.*, ¶ 116).  The male returned to the white van and drove toward East 160th Street. (*Id.*).  Roughly 90 minutes later, at 2:03 p.m., the agents saw the white van drive past the Tremaine Drive apartment building twice, first heading east and then heading west. (*Id.*, ¶ 118).  The white van then stopped at a pawn shop on Euclid Avenue, but eventually returned to the Tremaine Drive apartment and parked across the street. (*Id.*, ¶ 122).

At approximately 3:34 p.m., a FedEx truck arrived at the Tremaine Drive apartment building. (*Id.*, ¶ 124).  One of the males in the white van met the FedEx truck driver and accepted a brown box, which matched the description of the package containing the two

kilograms of compression binder.  (*Id.*).  The FedEx website showed the compression binder package was scanned as delivered at approximately that same time (3:36 p.m.).  (*Id.*).  The white van then left the Tremaine Drive apartment and drove to "Bratenahl Kitchen," located at 14002 Lakeshore Boulevard in Cleveland, arriving there at approximately 3:50 p.m.  (*Id.*, ¶ 125).  According to the Ohio Secretary of State, Hodge registered a business named "Bratenahl Corner Kitchen LLC" with that same address on February 2, 2022.  (*Id.*, ¶ 126).  The male who accepted the package got out of the white van and went inside Bratenahl Kitchen while talking on his phone.  (*Id.*, ¶ 125).  Ping information from Hodge's -2000 cell phone showed that Hodge was in the vicinity of Bratenahl Kitchen shortly beforehand, between approximately 2:53 p.m. and 3:13 p.m. (*Id.*, ¶ 126).  At 3:55 p.m. (roughly five minutes after arriving at Bratenahl Kitchen), the male who accepted the FedEx package came out of Hodge's Bratenahl Kitchen business and go back into his white van.  (*Id.*, ¶ 127).  The white van then went to an address on Locke Avenue in Cleveland, where one of the two males carried the FedEx package inside that residence.  (*Id.*, ¶ 128).  DEA investigators identified one of the two males in the white van as having a criminal history for drugs.  (*Id.*, ¶ 132-33).

Paragraphs 134 through 144 of the affidavit then describe surveillance that subsequently took place in December 2022.  (*Id.*, ¶ 134-44).  Among other facts, Paragraphs 137 and 138 describe how on December 13, 2022, Hodge's phone pings placed him at his Timberline Trail residence in the morning, while at the same time the silver Ford Escape was parked at the Omega Avenue unit.  (*Id.*, ¶ 137).  But later that afternoon, agents noticed Hodge's phone pings placed him at the Touch of Italy restaurant.  (*Id.* ¶ 138).  When the agents drove by the restaurant a short time later, Hodge's Ford Escape pulled onto Aurora Road and drove to the Omega Avenue unit.  *See* (*id.*, ¶ 138-39).  The next morning, December 14, 2022, an investigator drove by Hodge's

Timberline Trail residence and saw the silver Ford Escape parked in the driveway.  (*Id.*, ¶ 141).
Hodge's phone was pinging in the area of his Timberline Trail residece at approximately the
same time.  (*Id.*, ¶ 142).

   **F.    Hodge's multiple businesses and vehicles corroborate that his Timberline
          Trail residence and Omega Avenue business unit likely contained evidence of
          this ongoing drug conspiracy.**

   Paragraphs 145 and 146 of the affidavit describe how Hodge registered five different
LLC's through the State of Ohio and how Hodge used two vehicles (the Ford Escape and the
Ford Ranger) registered to those businesses.  (*Id.*, ¶ 145-46).

   The remainder of the affidavit sets forth some additional facts, as well as affiant's beliefs
and conclusions.  (*Id.*, ¶ 147-51).  Among other things, the affiant notes that although Hodge was
residing at the Timberline Trail residence, he did not appear to receive any mail there.  (*Id.*).
This, in combination with the fact that the Omega Avenue unit was registered to an apparently-
defunct business called Bounce Mountain LLC, *see* (*id.*, ¶ 70), indicated that "HODGE utilizes
so many different addresses in order to conceal the Target Locations from law enforcement," *see*
(*id.*, ¶ 147).  The affiant also recounts how Hodge had traveled either to or from the two Target
Locations before suspected drug deals (including the September 19th suspected drug money
drop-off by Thomas at the Touch of Italy parking lot).  *See* (*id.*, ¶ 148-149).  And the affiant
notes that "[a]s of the writing of this affidavit," phone ping information continued to show that
Hodge resided at the Timberline Trail house, and that he "continues to frequent [the Omega
Avenue Unit] for long periods of time."  (*Id.*, ¶ 150).

   Based on all of that, including the affiant's knowledge from 13 years as a DEA agent
about how drug traffickers keep ledgers, records, drug money, financial statements, contact
information for associates, digital records, and other similar types of evidence in their residences

19

and businesses, *see* (*id.*, ¶ 7), the affiant concluded that "HODGE utilizes both Target Locations

as the base of operations for his narcotics organization," (*id.*, ¶ 148), and that the evidence set

forth in the respective Attachment B's (which lists records and other similar types of evidence)

will be found there.  (*Id.*, ¶ 151).

### G. The assigned federal magistrate judge authorizes the search of Hodge's Timberline Trail residence and Omega Avenue business unit, and agents execute the warrants on January 11, 2023.

On January 9, 2023, the assigned federal magistrate judge issued search warrants for 804

Timberline Trail (Hodge's residence) and 5450 Omega Avenue, Unit 4 (Hodge's business

location).  The government has attached the search warrants, applications, Attachments A and B,

and the warrant returns/inventories to this filing.  (Hodge submitted the affidavit in his filing at

ECF 92, but did not appear to submit any other search warrant documents).

Agents executed the search warrants two days later, on January 11, 2023.  At the

Timberline Trail residence, agents encountered Hodge and an adult female.  They also found

four vehicles parked at the Timberline Trail house that were registered to various LLC's,

including the silver Ford Escape registered to Hodge's "Bratenahl Mobile Kitchen LLC"

business.  Agents seized the following items from Hodge's Timberline Trail residence:  five cell

phones (including Hodge's -8899 cell phone), a 9mm handgun and ammunition (underneath a

bed), a revolver (front passenger seat of a parked BMW), cash (in a plastic bag under the driver's

seat of the BMW), boxes of ammunition (front passenger seat of the BMW), and another 9mm

handgun and ammunition (trunk of the silver Ford Escape).  During the search, Hodge stated that

he used the unit at 5450 Omega Avenue for his "personal chef/catering business."  Hodge also

provided agents a garage door opener to access the Omega Avenue unit.

At the search of the Omega Avenue unit that same day, agents found a Ford F-150 pickup truck registered to "Around Your Way LLC" (another of Hodge's businesses) as well as three motorcycles, a laptop, a USB thumb drive and an external storage device, a plastic baggie with cocaine, an iPad, a DVR system, a hard drive tower, a suitcase that appeared to have contained a large amount of marijuana, a mini-scale, and various documents.

Agents thereafter obtained another federal search warrant to examine the electronic devices seized from Hodge's residence and business unit.  Among other information, they found a significant amount of drug-related information on the -8899 cell phone seized from Hodge's Timberline Trail residence.

On April 6, 2023, Melvin Hodge, Sherman Thomas, Carvin Cook, and Frank Black were named in this indictment.  (ECF 1: Indictment).  Hodge subsequently filed two motions to suppress, one claiming that the government illegally obtained cell phone tower data for Hodge's phone without a warrant, (ECF 90), and the other challenging the validity of the search warrants for his Timberline Trail residence and Omega Avenue business unit, (ECF 92).  The government is filing separate responses to each motion.

## II.    ARGUMENT

The Court should deny Hodge's motion to suppress at ECF 92.  As explained below:

(A) Hodge has failed to establish that he had a legitimate expectation of privacy at 5450 Omega Avenue, Unit 4;

(B) The affidavit established probable cause to search Hodge's Timberline Trail residence and Omega Avenue business unit for records and other similar evidence;

(C) Hodge has failed to meet his "heavy burden" for obtaining a *Franks* hearing; and

(D) Even if the search warrant affidavit is found to be deficient, the good faith exception to the exclusionary rule would preclude the suppression of evidence seized at the two locations.

## A.  Hodge has failed to establish that he had a legitimate expectation of privacy at the Omega Avenue business unit.

Although the government acknowledges that Hodge had a legitimate expectation of privacy in his Timberline Trail residence, the government disputes that Hodge had any such expectation of privacy at the Omega Avenue business unit.

Fourth Amendment rights are personal, meaning that "the central inquiry in any suppression hearing is whether the defendant challenging the admission of evidence has shown a legitimate expectation of privacy in the place searched or the thing seized."  *United States v. Adams*, 583 F.3d 457, 463 (6th Cir. 2009).  In order to establish a legitimate expectation of privacy, a defendant must show two things: "[first], whether the [defendant], by his conduct, has exhibited an actual expectation of privacy; that is, whether he has shown that he sought to preserve something as private, [and second,] whether the [defendant's] expectation of privacy is one that society is prepared to recognize as reasonable."  *Id.*  Once the government raises the issue, the burden shifts to the defendant to prove that they had a legitimate expectation of privacy in the place searched or the thing seized.  *United States v. Hunyady*, 409 F.3d 297, 300-01 (6th Cir. 2005).

Based on the information set forth in the affidavit and the discovery, 5450 Omega Avenue, Unit 4 was a business storage or garage unit, which is accorded less privacy than a residence.  *See Minnesota v. Carter*, 525 U.S. 83, 90 (1998) ("An expectation of privacy in commercial premises . . . is different from, and indeed less than, a similar expectation in an individual's home.") (quoting *New York v. Burger*, 482 U.S. 691, 700 (1987)).  Hodge also did not appear to be the lessee or owner of the Omega Avenue unit.  As described in the affidavit, an

"open source inquiry" showed that Unit 4 was "occupied by Bounce Mountain LLC, which appear[ed] to be a party supply rental company . . . registered to a male, Edward Mahone." (Search Warrant Affidavit, ¶ 70).  When an agent tried to call the listed phone number for Bounce Mountain LLC, "an automated voice system indicated [he] had reached the reservations department for a hotel."  (*Id.*).  Further, the Bedford Heights building department "confirmed [Unit 4] was registered to Bounce Mountain LLC with the last inspection being completed during the month of January 2013" (the search warrant was signed roughly ten years later in January 2023).  (*Id.*).  This all indicates that Hodge lacked a legitimate expectation of privacy in the Omega Avenue business unit.

The fact that Hodge frequently conducted activities at the Omega Avenue business unit and stored items there is insufficient to grant him a legitimate expectation of privacy.  *See Carter*, 525 U.S. 83 (holding that short-term guests who were present at another person's apartment for the sole purpose of packaging cocaine had no legitimate expectation of privacy in the apartment); *United States v. Whitehead*, 415 F.3d 583, 586-88 (6th Cir. 2005) (holding that defendant who frequently visited a dilapidated house to engage in "drug-related business transactions" lacked a legitimate expectation of privacy because "he never once slept at the residence" and "[the] house was dilapidated and unlivable").  Likewise, the fact that Hodge had a garage door opener to the Omega Avenue unit is insufficient to establish any legitimate expectation of privacy there.  *See United States v. Jefferies*, No. 3:07CR25-S, 2008 WL 90025, at *1 (W.D. Ky. Jan. 8, 2008) ("Simply leasing a premises and possessing a key does not create a reasonable expectation of privacy which society is willing to recognize as reasonable where the evidence shows that the location was used solely for conducting illicit business.").

Ultimately, Hodge bears the burden of establishing that he has a Fourth Amendment interest in the Omega Avenue business unit.  *See Hunyady*, 409 F.3d at 300-01.  Unless and until Hodge meets that burden, he cannot challenge the search of that location.

> **B.    The affidavit established probable cause to search Hodge's Timberline Trail residence and Omega Avenue business unit for records and similar items related to drug trafficking.**

Hodge claims that the affidavit to search his residence and business unit lacked probable cause because "there was no nexus between any alleged criminal conduct and the residence/business to be searched in this case," and also because "the affidavit relied upon stale information."  (ECF 92: Hodge Mot. to Supp., PageID 476-79).

This claim fails.  As explained below, the search warrant affidavit easily established that Hodge was engaged in a large-scale ongoing conspiracy to distribute and manufacture illicit drugs; that Hodge and his coconspirators used cell phones to communicate about that conspiracy; that Hodge had a number of LLC's registered in his name (including LLC's that were directly connected to the drug activity); and that Hodge used his residence and business in connection with the drug activity (including traveling to those locations before and after a suspected drug meeting with Sherman Thomas).  Based on those facts, in combination with the deference this Court must grant to the magistrate judge's probable cause finding, Hodge's challenge to the affidavit's probable cause fails.

> **1.    Legal Standard:  This Court must give "great deference" to the magistrate judge's probable cause finding, and only overturn that finding if the magistrate "arbitrarily exercised" their authority.**

When a defendant challenges the sufficiency of an affidavit, the reviewing court looks only to the four corners of the affidavit to determine if there was probable cause.  *United States*

*v. Brooks*, 594 F.3d 488, 492 (6th Cir. 2010) (citing *United States v. Pinson*, 321 F.3d 558, 565 (6th Cir. 2003)).

As the Sixth Circuit has recognized, "[p]robable cause is 'not a high bar to clear.'" *United States v. Rutledge*, 819 Fed. App'x 377, 379 (6th Cir. 2020) (quoting *United States v. Christian*, 925 F.3d 305, 311 (6th Cir. 2019)).  It only requires "a probability or substantial chance of criminal activity, not an actual showing of such activity."  *Id.* (quoting *United States v. Tagg*, 886 F.3d 579, 585 (6th Cir. 2018)).  Probable cause is not even a preponderance of the evidence inquiry.  *Greene v. Reeves*, 80 F.3d 1101, 1105 (6th Cir. 1996) (reversing district court's finding of no probable cause because the district judge improperly used a preponderance standard).  Instead, "[p]robable cause exists when there is a fair probability, given the totality of the circumstances, that contraband or evidence of a crime will be found in a particular place." *United States v. Brown*, 732 F.3d 569, 573 (6th Cir. 2013) (cleaned up).

Reviewing courts should give "great deference to the finding of the probable cause by the . . . judge issuing a warrant," *United States v. McLevain*, 310 F.3d 434, 439 (6th Cir. 2002), and ask whether the issuing judge "had a substantial basis for finding that the affidavit established probable cause to believe that the evidence would be found at the place cited," *Brown*, 732 F.3d at 573.  A reviewing court will "overturn that decision only if the magistrate arbitrarily exercised his or her authority."  *United States v. Christian*, 925 F.3d 305, 311-12 (6th Cir. 2019) (en banc) (internal quotations omitted).  The reviewing court should not engage in "hypertechnical critique" or "line-by-line scrutiny."  *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000) (en banc).  Its "job is not to reweigh the assertions in an affidavit."  *Christian*, 925 F.3d at 310.

This deferential review of the magistrate's probable cause determination is needed to "further the Fourth Amendment's strong preference for searches conducted pursuant to a

warrant." *Massachusetts v. Upton*, 466 U.S. 727, 733 (1984). As the Sixth Circuit has explained:

> When . . . there is at issue the quantum of evidence necessary to be alleged to support a finding of probable cause, and . . . the affidavit arguably shows circumstances which could support a determination that evidence of a federal crime will probably be found in the place to be searched, the court should . . . foster increased use of warrants [by] giv[ing] law enforcement officials the assurance that when a warrant is obtained in a close case, its validity will be upheld.

*United States v. Hatfield*, 599 F.2d 759, 761 (6th Cir. 1979) (quoting *United States v. Giacalone*, 541 F.2d 508, 513-14 (6th Cir. 1976) and *United States v. Lewis*, 392 F.2d 377, 379 (2d Cir.), *cert. denied*, 393 U.S. 891 (1968)).

The issuing magistrate "may give considerable weight to the conclusion of experienced law enforcement officers regarding where evidence of a crime is likely to be found and is entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense." *United States v. Mick*, 263 F.3d 553, 566 (6th Cir. 2001) (citing *United States v. Caicedo*, 85 F.3d 1184, 1192 (6th Cir. 1996)). Further, an affidavit is judged on the adequacy of what it contains, not on what it lacks or what a critic might say should have been added. *United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000).

A search warrant must also establish a "sufficient nexus" between the place to be searched and the evidence sought. *United States v. Kenny*, 505 F.3d 458, 461 (6th Cir. 2007) (citing *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004)). Whether there is a sufficient nexus between the place searched and the evidence sought is a common-sense inquiry that considers "the type of crime being investigated, the nature of the things to be seized, the extent of an opportunity to conceal the evidence elsewhere, and the normal inferences that may be drawn as to likely hiding places." *United States v. Savoca*, 761 F.2d 292, 298 (6th Cir. 1985);

26

*see also United States v. Tate*, 586 F.3d 936, 943 (11th Cir. 2009) ("Evidence that a defendant has stolen material which one normally would expect him to hide at his residence will support a search of his residence").

In line with that principle, the Sixth Circuit has recognized that when an individual is engaged in an ongoing criminal scheme (as was the case here), records and other similar evidence are likely to be found at that individual's residence or business. *See United States v. Abboud*, 438 F.3d 554, 572 (6th Cir. 2006); *United States v. Hills*, 27 F.4th 1155, 1191-93 (6th Cir. 2022). As the Sixth Circuit explained, "[o]ne does not need Supreme Court precedent to support the simple fact that records of illegal business activity are usually kept at either a business location or at the defendant's home. Likewise, personal financial records are also usually stored at a person's home or place of business." *Abboud*, 438 F.3d at 572.

Instructively, in *Abboud*, federal agents were investigating a bank fraud case involving check kiting, and the warrant was based on evidence from 1999, even though the search was conducted in 2002. *Id.* at 574. In concluding that the warrant was not based on stale evidence, the court relied on the fact that the character of the crime was such that it involved "numerous" incidents of bank fraud; that the defendant was entrenched by owning multiple business and a residence in the area; that the business records sought were likely to be found at the defendant's home or business long after the fraud was concluded; and that such records were likely to be kept at a home or business. *Id.*

Similarly in *Hills*, which involved a group of Cleveland dentists involved in an "ongoing bribery and kickback scheme occurring over several years," the Sixth Circuit held there was probable cause to search the defendant's residence and businesses because he "owned a home and several businesses in the area so he was entrenched at the places to be searched," the "things

27

sought to be seized (mostly business records) were the type that would be kept for an extended period of time (as opposed to drugs)," and the defendant's residence "was the type of place such records would be kept."  *Hills*, 27 F.4th 1191-93.

    **2.**   **The Sixth Circuit's cases on nexus to a drug trafficker's residence.**

   Within that context, Sixth Circuit has "struggled to identify the quantum of evidence needed to connect drug trafficking by an individual to a probability that evidence will be found at the individual's residence[.]"  *United States v. Reed*, 993 F.3d 441, 448 (6th Cir. 2021) (quoting *United States v. Ardd*, 911 F.3d 348, 351 (6th Cir. 2018)).  On one hand, the Sixth Circuit has said that "[i]n the case of drug dealers, evidence is likely to be found where the dealers live."  *Reed*, 993 F.3d at 448 (citing seven cases from the Sixth Circuit supporting that proposition).  "These decisions suggest that courts generally may find a nexus to search a drug dealer's home 'even when there is absolutely no indication of any wrongdoing occurring there.'"  *Reed*, 993 F.3d at 448 (quoting *United States v. Sumlin*, 956 F.3d 879, 886 (6th Cir. 2020) (internal quotations omitted).

   On the other hand, the Sixth Circuit has "rejected 'the proposition that the defendant's status as a drug dealer, standing alone, gives rise to a fair probability that drugs will be found in his home.'"  *Reed*, 993 F.3d at 448 (quoting *United Staes v. Brown*, 828 F.3d 375, 382 (6th Cir. 2016)).  "These decisions suggest that courts generally may not find a nexus to search a drug dealer's home when 'the affidavit fails to include facts that directly connect the residence with the suspected drug dealing activity, or the evidence of this connection is unreliable.'"  *Reed*, 993 F.3d at 448 (quoting *Brown*, 828 F.3d at 384).

   The Sixth Circuit has "reconciled" these potentially conflicting holdings about probable cause "in fact-specific ways."  *Reed*, 993 F.3d at 448.  For example, the court found that

probable cause existed when a suspect caught with drugs lied about his home address, *United States v. Caicedo*, 85 F.ed 1184, 1193 (6th Cir. 1996), and also when a suspect left a home, undertook a drug deal, and then returned there, *United States v. Ellison*, 632 F.3d 347, 349 (6th Cir. 2011).

But "[e]ven if no specific evidence ties drug dealing to a home, [the Sixth Circuit] ha[s] also called it 'well established' that a nexus to search the home can exist if a suspect's drug dealing is 'ongoing' at the time the police seek the warrant." *Reed*, 993 F.3d at 448 (quoting and citing five Sixth Circuit cases). Though in some cases, the Sixth Circuit has "limit[ed] the principle that a drug dealer's ongoing drug operations can create probable cause to search the dealer's home," *Reed*, 993 F.3d at 449 (citing examples), such as where the affidavit only showed that the suspect engaged in one drug transaction, *see United States v. Fitzgerald*, 754 Fed. App'x 351, 360 (6th Cir. 2018), where the drug activity was stale from a significant time ago, *see United States v. Ward*, 967 F.3d 550, 555-57 (6th Cir. 2020), and where the defendant was not a known drug dealer and may have only possessed drugs for personal use, *see United States v. McPhearson*, 469 F.3d 518, 524-25 (6th Cir. 2006).

Ultimately though, this Court does not need to delve into "the hazy constitutional border between a sufficient nexus and an insufficient hunch[,]" *see Reed*, 993 F.3d at 450, because as explained below, the affidavit easily establishes a connection between Hodge's ongoing drug trafficking activity and the two places to be searched.

### 3. The affidavit established probable cause to search Hodge's Timberline Trail residence and Omega Avenue business unit.

The affidavit set forth facts showing how Hodge participated in an ongoing conspiracy to manufacture kilogram-quantities of illicit pills from items ordered online, and why evidence of

those crimes would be found at his Timberline Trail residence and Omega Avenue business location.

Without repeating all of the information set forth in the affidavit, the government would note the following brief summary of the facts, which illustrates why the magistrate judge had a "substantial basis" to find that probable cause existed to search Hodge's residence and business unit, *see Brown*, 732 F.3d at 573:

- Thomas received or coordinated the receipt of shipments containing large quantities of pill binding agents and other materials used to manufacture illicit pills.  (Search Warrant Affidavit, ¶ 14-29).

- Hodge and Thomas had a drug relationship that went back for almost one year, and they communicated by phone about it.  (*Id.*, ¶ 64-66).  According to quoted text messages (read in light of the affiant's 13 years of experience as a DEA agent), Hodge and Thomas previously used the Touch of Italy as a meeting place for Thomas to give Hodge drug money.  (*Id.*).

- Around 11:11 p.m. on September 18, 2022, Hodge and Thomas had three phone contacts.  (*Id.*, ¶ 44).  Roughly an hour later, Thomas drove to an area in Bedford Heights that was roughly a half-mile away from Hodge's Omega Avenue business unit, then returned back to his Father Caruso Drive apartment.  *See* (*id.*, ¶ 45).  On following day, September 19, 2022, after Hodge and Thomas continued contacting each other by phone, Thomas appeared to drop off drug money in Hodge's silver Ford Escape in the Touch of Italy parking lot while Hodge waited inside, which matched their earlier text messages about drug payments taking place there.  (*Id.*, ¶ 44-66).  Thomas returned to his Father Caruso Drive apartment after that suspected Touch of Italy drug money drop-

30

off, and was seen talking on his phone at approximately the same time Hodge walked out of the restaurant to look inside the parked Ford Escape.  (*Id.*, ¶ 54-56).  This corroborated that Thomas and Hodge were discussing where Thomas had left drug money in the Ford Escape.  Also, prior to that suspected September 19th drug money drop-off, Hodge's phone placed him near the Omega Avenue business unit.  (*Id.*, ¶ 47).  And after it, Hodge returned to his Timberline Trail residence, (*id.*, ¶ 62), indicating that both locations were connected to Hodge's drug trafficking, and that Hodge brought the drug cash back to his residence.

- On the following day, September 20, 2022, Thomas picked up a UPS package containing kilogram-quantities of compression binder, and took it to a suspected stash house at 2140 Reyburn Road.  (*Id.*, ¶ 28-29).  Thomas then traveled between his Father Caruso Drive apartment and the Reyburn Road suspected stash house.  *See* (*id.*, ¶ 29).

- On September 28, 2022, agents searched Thomas's Father Caruso Drive apartment and Reyburn Road stash house, and found large quantities of methamphetamine pills, items used to manufacture those pills, firearms, and cell phones used to arrange drug business.  (*Id.*, ¶ 30-34).  This further corroborated that Thomas and Hodge had a drug relationship, and that Thomas had received drugs from Hodge near the Omega Avenue business unit during the early morning hours of September 19, 2022.  Also, the fact that Thomas possessed cell phones in his residence that he used to communicate with Hodge about drug business corroborated that Hodge's residence was likely to contain similar electronic evidence.

- Hodge appeared to be involved in large-scale, high-level drug trafficking, which lent support to the conclusion that records and similar evidence would be found in his house

31

and business.  For example, L.D. had seven phone contacts with Hodge on the same day he dropped off $250,000 in drug cash to an undercover DEA agent.  (*Id.*, ¶ 94-95). Hodge's Ford Escape and L.D.'s Land Rover then appeared to be in the same place roughly two weeks later, on November 7, 2022, while Hodge was engaged in counter-surveillance driving.  (*Id.*, ¶ 85-93).  Hodge also used WhatsApp to communicate with his suspected Mexican supplier, and his WhatsApp account contained a "unique identifier" associated with a Charter Communications account subscribed to his Timberline Trail residence.  (*Id.*, ¶ 40,148).

- Hodge had multiple LLC's registered in his name, including the various "Bratenahl Kitchen" businesses that appeared to be connected to the drug activity.  (*Id.*, ¶ 145-46). For example, on December 1, 2022, two men picked up a FedEx shipment of pill compression binder and drove it to Hodge's Bratenahl Kitchen business, shortly after Hodge's cell phone was in the vicinity of that business.  (*Id.*, ¶ 113-33).

- Hodge's silver Ford Escape, which was used in suspected drug meetings and money transfers, was registered to one of his "Bratenahl Kitchen" businesses.  (*Id.*, ¶ 40-41). Hodge often parked that Ford Escape at either his Timberline Trail residence or his Omega Avenue business unit, indicating that Hodge was conducting drug activity at his residence and business.  (*Id.*, ¶ 148-49).

- Hodge appeared to be conducting drug business at his Omega Avenue business unit, which was associated with an apparently-defunct business called Bounce Mountain LLC.  (*Id.*, ¶ 70).  In particular, on September 19, 2022, Hodge appeared to come from the vicinity of the Omega Avenue unit before going to the Touch of Italy parking lot, where Thomas appeared to leave drug money in Hodge's parked vehicle.  (*Id.*, ¶ 44-66).

On October 5, 2022, Hodge confronted an undercover DEA surveillance agent outside the Omega Avenue unit while an associate in a black Porsche waited nearby, became suspicious that the undercover agent was "police," and eventually drove to the Touch of Italy restaurant at a high rate of speed, where his associate in the black Porsche "star[ed]" at an undercover surveillance agent.  (*Id.*, ¶ 67-75).  On November 10, 2022, while at the Omega Avenue unit, Hodge retrieved a small satchel from his Ford Escape, gave it to the driver of that black Porsche, and the Porsche driver gave Hodge a manila envelope in return.  (*Id.*, ¶ 96-107).  And on November 16, 2022, Hodge briefly pulled his Ford Escape into the Omega Avenue garage bay, closed the door, and then brought it back out after a short time, (*id.*, ¶ 108), as if he were trying to hide a transaction.  All of that was consistent with Hodge using the Omega Avenue business unit for drug activity.

- Finally, based on the affiant's 13 years of experience as a DEA agent—experience that the magistrate judge was entitled to give "considerable weight," *see Mick*, 263 F.3d at 566—the affidavit described how drug traffickers often store records and other similar evidence (including electronic records) in their homes and businesses, and why Hodge's residence and business were likely to contain that type of evidence.  (Search Warrant Affidavit, ¶ 1-7, 145-51).

Again, this Court's role is limited to asking whether the magistrate judge had a "substantial basis" for finding probable cause.  *Brown*, 732 F.3d at 573.  This Court should only overturn that finding "if the magistrate arbitrarily exercised his or her authority."  *Christian*, 925 F.3d at 311-12.  Based on the information set forth in the affidavit, the magistrate judge was justified in finding probable cause to search Hodge's residence and business, especially given the

ongoing and scope of the drug trafficking activity and the affiant's experience-based

conclusions.  The magistrate judge therefore had a "substantial basis" for issuing these warrants.

### 4.  Hodge's arguments to the contrary about probable cause are meritless.

Hodge first argues that "[n]othing within the four corners of the affidavit showed a fair

probability that narcotics would be found at either the residence or the business."  (ECF 92:

Hodge Mot. to Supp., PageID 477).  But the search warrants here were not directed at seizing

drugs.  Instead, the Attachment B's listed various non-drug items including "[b]ooks, records,

receipts, bank statements and records," "log-books . . . relating to [the] distribution of controlled

substances," and "cell phones [and] [a]ny storage medium that could contain the records and

information listed above."  (The government has included the search warrant documents and

attachments in this filing,).  As the Sixth Circuit has recognized, those types of evidence are

likely to be found in a defendant's residence or business, especially where the criminal activity is

ongoing and the defendant is "entrenched" at the locations to be searched, as Hodge was here.

*See Hills*, 27 F.4th 1155, 1191-93; *Abboud*, 438 F.3d 554, 572-74.[5]

---

[5] Although Hodge did not raise this issue in his motion, the government notes, for the sake of transparency, that the agents brought a drug-sniffing canine with them during both search warrants.  The agents did this because the Attachment B's permitted law enforcement to search for bulk cash, which often has the odor of drugs on it.  The canine was therefore present to help find cash, which the search warrants allowed.  The DEA-6 reports that Hodge received in discovery discussed this.

Again, Hodge does not contest anything about the presence of a drug-sniffing canine at the warrant executions in his motion.  But even assuming for the sake of argument that bringing a drug-sniffing canine to the searches exceeded the scope of  the Attachment B's, Hodge would still need to show some causal connection between the drug canine and any evidence seized.  *See Hudson v. Michigan*, 547 U.S. 586, 594 (2006) (explaining that a "but-for causality" link between an illegal search and the evidence to be suppressed is a "necessary, not a sufficient, condition for suppression").

Hodge also cites *United States v. Brown*, 828 F.3d 375 (6th Cir. 2016) to support his claim that the affidavit lacked probable cause.  (ECF 92: Hodge Mot. to Supp., PageID 478).  But the facts of *Brown* are not applicable here.

*Brown* involved the search of a Ricky Brown's house on Moross Road in Detroit after law enforcement arrested Brown on March 8, 2011, for being a passenger in a vehicle with Marzell Middleton, who planned to sell heroin to an informant.  *Brown*, 828 F.3d at 378-79.  According to the affidavit to search Brown's house, during Brown and Middleton's arrest on March 8th while traveling together in a truck, police found four cell phones (two belonging to Middleton, two belonging to Brown), and approximately $4,000 in suspected drug cash that belonged to Brown.  *Id.*  During booking, Brown stated that he lived at a house on Moross Road in Detroit, which matched the information on his driver's license.  *Id.*  On one of Brown's cell phones (which had no subscriber information), law enforcement found a text message saying, "*He said 1175 or 1125 for one*," which the affiant believed was referring to the price for an ounce of cocaine.  *Id.* at 379-80.  The only other points of information in the affidavit about Brown or his Moross Road house was that Brown had a conviction for conspiracy to distribute marijuana from twelve years earlier, and that during a search of Middleton's residence after their March 8th arrest, police found a parked GMC Yukon, registered to Brown at his Moross Road house.  *Id.* at 378-80.  A drug dog alerted to the odor of narcotics in Brown's GMC Yukon that was parked outside Middleton's house, but the affidavit for Brown's house did not say whether or not any drugs were ever found inside that vehicle.  *Id.* at 379.  Based on that information, law enforcement obtained a search warrant for Brown's Moross Road house and seized firearms, marijuana, and other items.  *Id.* at 380.

The Sixth Circuit held that the affidavit for searching Brown's Moross Road house lacked probable cause because there was no nexus between the house and any alleged criminal activity.  *Id.* at 382-83.  "[The] affidavit contained no evidence that Brown distributed narcotics from his home, that he used it to store narcotics, or that any suspicious activity had taken place there."  *Id.* at 382.  The Sixth Circuit also rejected the government's argument that the search of Brown's house was justified simply based on Brown being a "known drug dealer," in part, because "the evidence supposedly establishing Brown's status as a known drug dealer was . . . inadequate."  *Id.* at 384.[6]

Here, unlike *Brown*, the affidavit for Hodge's residence and business set forth numerous examples of how those locations were connected to his drug activity, including how Hodge traveled to or from those locations before or after a drug deals (the September 19th Touch of Italy money drop-off), how Hodge moved the Ford Escape (registered to his Bratenahl Kitchen business, and also used to store and transport drug money) between those two locations, and how Hodge's drug activities directly connected to those locations (including Hodge using a WhatsApp account connected to his residence to communicate with a suspected drug supplier in Mexico, and Hodge using the Omega Avenue business unit to conduct suspected drug or money

---

[6] In *Brown*, the Sixth Circuit also acknowledged the tension in its case law about whether a defendant's "status as a drug dealer" can justify the search of the their residence, without any nexus to criminal activity there.  828 F.3d at 382-83.  *Brown* did not resolve that issue, but it did recognize that the Sixth Circuit had permitted that type of search in cases "distinct from the typical drug trafficking case," where "the affidavits did not just establish that the defendants were drug dealers, but contained overwhelming evidence that the defendants were major players in a large, ongoing drug trafficking operation."  *Id.* at n.2 (citing three Sixth Circuit cases).

transfers).  So unlike *Brown*, the affidavit here established a nexus between Hodge's illegal drug activity and the two places to be searched.

Another difference is that the drug activity in *Brown* was isolated and relatively unsophisticated.  At most, Brown was a passenger in a vehicle with someone who intended to sell heroin to an informant, Brown's cell phone contained a text message discussing the price for an ounce of cocaine, and Brown's vehicle smelled like drugs.  *Brown*, 828 F.3d at 378-80. Here, in contrast, Hodge had a drug relationship with Thomas that went back at least one year to November 2021 (when they texted about meeting at Touch of Italy to exchange drug money), Hodge's drug-related activity continued through December 2022 (when men in a white van picked up a FirmaPress shipment and then drove to Hodge's Bratenahl Kitchen business), and the DEA's investigation showed that Hodge's drug activity was large-scale, as opposed to street-level (Hodge was communicating with L.D., who gave $250,000 in drug money to an undercover agent; Hodge was using WhatsApp to communicate with a suspected Mexican drug supplier; and Hodge's compatriots were manufacturing kilogram-quantities of illicit pills using items ordered online, which was enough material to manufacture 200,000 pills).

Further, the DEA's investigation showed that Hodge used various LLC businesses in connection to his drug trafficking activity.  This fact that was not present in *Brown*.  Hodge's use of multiple business LLC's also made more it likely that records and similar non-drug evidence would be found in his residence and business.  *See Abboud*, 438 F.3d at 572 ("One does not need Supreme Court precedent to support the simple fact that records of illegal business activity are usually kept at either a business location or at the defendant's home.  Likewise, personal financial records are also usually stored at a person's home or place of business.").

For all of those reasons, Hodge's reliance on *Brown* is misplaced.

37

Hodge's final probable cause argument is that the "affidavit relied upon stale information" because it included the November 2021 message conversation between Hodge and Thomas, in which they discussed meeting at "touch [of Italy]" so that Thomas could give Hodge drug money.  (ECF 92: Hodge Mot. to Supp., PageID 479).  This argument also fails.

Staleness depends on "the inherent nature of the suspected crime and the objects sought."  *United States v. Akram*, 165 F.3d 452, 456 (6th Cir. 1999).  The factors used in making that determination include: "(1) whether the character of the crime is a chance encounter or continuous in nature; (2) whether the suspected criminal is nomadic or entrenched; (3) whether the evidence to be seized is perishable or enduring; and (4) whether the place to be searched is a mere forum of convenience or secure operational base."  *Hills*, 27 F.4th at 1192 (quoting *United States v. Hampton*, 760 F. App'x 399, 402 (6th Cir. 2019)).  Evidence of ongoing criminal activity will generally defeat a claim of staleness.  *United States v. Greene*, 250 F.3d 471, 481 (6th Cir. 2001).

Here, the November 2021 message conversation between Hodge and Thomas was corroborated by fresh information, including their suspected drug money transfer that happened at the Touch of Italy on September 19, 2022; the September 28th search warrants at the two locations connected to Thomas (Father Caruso Drive and Reyburn Avenue) where drugs, firearms, cell phones, and pill-pressing items were found; Hodge's seven phone contacts with L.D. on October 25, 2022 (the same day that L.D. gave $250,000 in drug cash to an undercover agent); ongoing surveillance of Hodge traveling between his residence and his business using the Ford Escape with the suspected trap door; the December 1, 2022 surveillance where two men in a white van retrieved a FedEx parcel containing two kilograms of pill compression binder and then drove to Hodge's Bratenahl Kitchen business; and the multiple LLC's that had been

38

registered by Hodge and used in connection with this investigation (including Hodge's use of the Ford Escape registered to his LLC). So the affidavit did not rely on stale information.

For those reasons, the magistrate judge had a "substantial basis" for finding probable cause to issue the warrants. *See Brown*, 732 F.3d at 573. Hodge's challenges to the affidavit's probable cause therefore fail.

### C. Hodge has failed to meet his "heavy burden" for showing that the affidavit contained any false statements that would justify a *Franks* hearing.

Hodge also claims that the affidavit for his Timberline Trail residence and the Omega Avenue business unit contained false or misleading information. (ECF 92: Hodge Mot. to Supp., PageID 466-76). But none of the information Hodge identifies from the affidavit is false or misleading, let alone sufficient to warrant a *Franks* hearing. Hodge has therefore failed to meet his "heavy burden" for obtaining a *Franks* hearing.

### 1. Legal Standard:  Hodge bears a "heavy burden" to obtain a *Franks* hearing.

Before being granted a hearing to challenge an affidavit's truthfulness, the defendant must make "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit," and also demonstrate that "the allegedly false statement is necessary to the finding of probable cause." *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978). The defendant bears a "heavy burden" to show this, *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990), because warrant affidavits enjoy "a presumption of validity," *Franks*, 438 U.S. at 171. This heavy initial burden is designed to prevent defendants from abusing the process, and to ensure that frivolous attacks on a warrant do not result in minitrials. *Id.* at 170. The defendant's challenge "must be more than conclusory and must be supported by more than a mere desire to

cross-examine" to trigger a hearing.  *Id.* at 171-72.  "There must be allegations of deliberate falsehood or of reckless disregard for the truth," "those allegations must be accompanied by an offer of proof," and "[a]ffidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained."  *Id.*

*Franks* is generally "inapplicable to the omission of disputed facts" in an affidavit, "except in the very rare cases where the defendant makes a strong preliminary showing that the affiant with an intention to mislead excluded critical information from the affidavit."  *Mays v. City of Dayton*, 134 F.3d 809, 816 (6th Cir. 1998) (emphasis removed).  As a result, "[a]lthough material omissions are not immune from inquiry under *Franks* . . . an affidavit which omits potentially exculpatory information is less likely to present a question of impermissible conduct than one which affirmatively includes false information."  *United States v. Atkin*, 107 F.3d 1213, 1217 (6th Cir. 1997).

Finally, a *Franks* hearing is not required if the allegedly false statement in the warrant affidavit is not necessary to the finding of probable cause.  *Franks*, 438 U.S. at 155-56.  Put differently, if there is sufficient content to support a finding of probable cause remaining in the warrant affidavit after "material that is the subject of the alleged falsity or reckless disregard is set to one side," no hearing is required.  *Id.* at 171-72.

> ## 2.  The nine claims Hodge raises about the affidavit are not false or misleading.

Hodge raises nine claims about what he asserts to be false or misleading information in the search warrant affidavit.  But as explained below, none of the information identified by Hodge is false or misleading.  And even if Hodge could show that information were false or misleading, and that the affiant included it with an intent to mislead the magistrate judge, that

information was not essential to the finding of probable cause. Hodge has thus failed to meet his

"heavy burden" for obtaining a *Franks* hearing.

> a. **Claim 1: Paragraph 13 of the affidavit (discussing the seizure of large quantities of multi-colored methamphetamine pills in July 2022) was referring to a different investigation, not this investigation into Hodge.**

Paragraph 13 of the affidavit, which is part of the introductory section titled

"Compression Binder, Pill Presses and Narcotics," states as follows:

> 13.    I am currently part of **another active DEA investigation** regarding the distribution of illicit narcotics involving methamphetamine pills. Members of this drug trafficking organization are obtaining large kilogram quantities of compression binder from an online retail website  During the course of the investigation investigators have seized multi-pound quantities investigators seized approximately 1,000 multi-colored pills pressed into various shapes from a member of the DTO. The DEA North Central Laboratory analysis of these multicolored pills identified the pills contained methamphetamine. Additionally, I was informed by a DEA Supervisory Chemist that since January of 2022, other DEA offices have submitted drug exhibits of similar multicolored pills which contained methamphetamine as well as caffeine.

(Affidavit, ¶ 13) (emphasis added).

Hodge claims that this paragraph includes "false statements" because "throughout the

discovery phase of this case, it has been discovered that there was no such seizure of pills or

narcotics intended for any member of [Hodge's] DTO[.]"  (ECF 92: Hodge Mot. to Supp., PageID

466-67).

Hodge, however, ignores the very first sentence of Paragraph 13, which clarifies that the

affiant was referring to the seizure of pills in "another active DEA investigation," not this

investigation into Hodge.  The purpose of Paragraph 13 was to provide background information

on how compression binder is used to press multi-colored methamphetamine pills.  There is

nothing misleading or false about that.

Nonetheless, even assuming that Paragraph 13 was referring to *this* investigation into Hodge and Thomas (which it was not), the DEA agents in this case did eventually seize large quantities of multi-colored methamphetamine pills during the search of Thomas's Father Caruso Drive residence on September 28, 2022, as described in Paragraphs 30 through 33 of the affidavit. And even if this statement in Paragraph 13 were false (again, it is not), it was not essential to the finding of probable cause. *See Franks*, 438 U.S. at 155-56

Paragraph 13 therefore contained no false or misleading information, and does not warrant a *Franks* hearing.

> **b. Claim 2: The reference to Sherman Thomas's two residences as "Target Locations 1 and 2" in Paragraph 29 was, at most, a typographical error copied from an earlier affidavit, which is clear when reading this affidavit in context.**

As the Sixth Circuit has recognized, "[a] defendant cannot demonstrate entitlement to a *Franks* hearing by merely identifying typographical errors in the affidavit." *United States v. Frazier*, 423 F.3d 526, 539 (6th Cir. 2005).

In Paragraph 9 ("Properties to be Searched"), the affidavit states that 804 Timberline Trail will be referred to as "**Target Location 1"** and 5450 Omega Avenue, Unit 4 will be referred to as "**Target Location 2."** Both of those short-hand terms appear in bolded font throughout the rest of the affidavit.

Hodge complains that Paragraph 29 of the affidavit (which discusses the lead-up to the September 28th search warrants at the two locations connected to Sherman Thomas: 5900 Father Caruso Drive and 2140 Reyburn Road) mistakenly refers to 5900 Father Caruso Drive and 2140 Reyburn Road as "Target Location 1" and "Target Location 2" (without any bolded font). *See* (ECF 92: Hodge Mot. to Supp., PageID 467-69). Paragraph 29 states as follows:

> 29.     On September 20, 2022, investigators surveilled THOMAS
> pick up the UPS packages from 1641 Belmar Road and ultimately
> end up taking the [multi-colored pill binding] packages to 2140
> Reyburn Road, Cleveland, Ohio 44112. Over the course of the next
> week, investigators surveilled THOMAS on multiple occasions
> traveling back and forth between Target Location 1 and Target
> Location 2 while the GPS pings on THOMAS' phones (216) 440-
> 9498 and (440) 226-4638 tracked with the physical movements of
> THOMAS.

(Search Warrant Affidavit, ¶ 29).  Hodge claims that this is a "false statement" warranting

suppression because "this incorrect information was improperly relied upon by the Magistrate

Judge in the issuance of the search warrant [for Timberline Trail and Omega Avenue]."  (*Id.*).

But as Hodge himself acknowledges, this language in Paragraph 29 matches word-for-

word the language from prior search warrant affidavits in the case, which also referred to 5900

Father Caruso Drive and 2140 Reyburn Road as "Target Locations 1 and 2."  *See* (*id.*, PageID

468-69).  The affiant's reference in Paragraph 29 to "Target Locations 1 and 2" was therefore (at

most) a typographical error left-over from previous affidavits, which does not warrant a *Franks*

hearing.  *See Frazier*, 423 F.3d at 539.  Also, the same federal magistrate judge who issued this

warrant issued those previous warrants, which further undercuts any claim that the reference to

"Target Locations 1 and 2" in Paragraph 29 was done "knowingly and intentionally, or with

reckless disregard for the truth[.]"  *See Franks*, 438 U.S. at 155-56.  It was simply a paragraph

copied from a previous affidavit that was not updated to reflect "Target Locations 1 and 2"

referring to Hodge's Timberline Trail residence and Omega Avenue business unit in this

affidavit.

This becomes even more clear when reading the affidavit in context, which Hodge fails

to do.  In particular, Paragraphs 25 through 27 are under a section titled "Surveillance and the

Identification of Sherman Thomas," and discuss how investigators identified Sherman Thomas,

and also how Thomas resided at 5900 Father Caruso Drive.  (Search Warrant Affidavit, ¶ 25-27).

Paragraphs 28 and 29 are under a section titled "Surveillance Delivery of Compression Binder on

September 20, 2022," and discuss how Thomas picked up packages of compression binder from

1641 Belmar Road and drove them to 2140 Reyburn Road.  (*Id.*, ¶ 28-29).   Then, Paragraphs 30

through 34 are under a section titled "Search Warrants on September 28, 2022," and discuss how

agents executed warrants at 5900 Father Caruso Drive and 2140 Reyburn Road on September 28,

2022.  (*Id.*, ¶ 30-34).

And if there was any doubt left about what Paragraph 29 meant by Thomas "traveling

back and forth between Target Location 1 and Target Location 2" in the week after he picked up

the September 20th pill compression binder, Paragraph 34 clears that doubt up.  Paragraph 34

discusses the cell phones seized from Thomas's residence at 5900 Father Caruso Drive, and

states as follows:

> 34. On October 4, 2022, the Honorable Jonathan D. Greenberg
> signed a federal search warrant authorizing the search of the cellular
> telephones seized and located within Target Location 1. The cellular
> telephone seized at THOMAS' residence were identified to be the
> following telephone numbers: (440) 426-4638, (216) 440-9498,
> (606) 485-6271, (314) 699-1761, (216) 760-9504 and (216) 280-
> 6810.

(*Id.*, ¶ 34).  In other words, Paragraph 34 contained the same typographical error that appeared in

Paragraph 29.  Notably, Hodge did not raise any issues about Paragraph 34, and indeed, appears

to have fully understood what that paragraph meant.  *See* (ECF 92: Hodge Mot. to Supp., PageID

453) ("The cellular phones recovered from the Father Caruso residence were (440) 426-4638

(Phone #5), (216) 440-9498 (Phone #4), (606) 485-6271 (Phone #7), (314) 699-1761 (Phone #8),

(216) 760-9504 (Phone #9) and (216) 280-6810 (Phone #10). *Id.* at ¶34.").  It is not clear how

Hodge can argue that the affiant intended to mislead the magistrate judge based on a

typographical error in Paragraph 29, while at the same time acknowledging that he understood what the affiant meant when the same typographical error occurred in Paragraph 34. Moreover, as discussed above, those references to the "Target Locations" in Paragraphs 29 and 34 are not bolded, whereas the remaining references to "Target Location 1 and 2" in the affidavit (referring to 804 Timberline Trail and 5450 Omega Avenue) are bolded, which further clears up any potential confusion.

Ultimately, Hodge bears the "heavy burden" of showing that the affidavit contained false statements made "knowingly and intentionally, or with reckless disregard for the truth[.]" *See Franks*, 438 U.S. at 155-56. Simply pointing out a typo that left-over from a previous affidavit (reviewed by the same magistrate judge) falls far short of meeting that heavy burden. *See Frazier*, 423 F.3d at 539. And even if Hodge somehow were able to meet his burden of showing that the reference to "Target Locations 1 and 2" in Paragraph 29 was made with an intent to mislead the magistrate judge, that statement was not essential to the probable cause to search 804 Timberline Trail and 5450 Omega Avenue. Hodge has therefore failed to show that anything in Paragraph 29 would warrant a *Franks* hearing.

> c. **Claim 3: The reference in Paragraph 95 to seven phone contacts between Hodge and L.D. on October 25, 2022 (the individual who gave $250,000 in drug cash to a DEA undercover agent that same day) is fully supported by subpoenaed toll records.**

Paragraphs 94 and 95 of the affidavit describe how on October 25, 2022, law enforcement used an undercover agent to pick up "$250,000" in "narcotics proceeds" from L.D. (Search Warrant Affidavit, ¶ 94-95). Based on "open source records as well as corroboration through historical investigative information," DEA agents were able to identify L.D.'s phone number as (216) 299-6130. (*Id.*, ¶ 95). According to pen register information, Hodge's -2000

45

phone number had "approximately 7 contacts" with L.D.'s -6130 number on that same date. (*Id.*).  Agents also learned that L.D. drove a black Land Rover, which was notable because on November 7, 2022 (approximately two weeks after the drug money pickup from L.D.), investigators tracked Hodge's silver Ford Escape near the area of 1024/1028 East 74th Street in Cleveland, where they also saw L.D.'s Land Rover.  (*Id.*, ¶ 88, 94).

Hodge claims that "the pen register data provided to defense counsel for [Hodge's -2000 phone] does not indicate that there were any contacts with [L.D.'s -6130 phone] or any other individuals on October 25, 2022."  (ECF 92: Hodge Mot. to Supp., PageID 469-70).  To support this claim, Hodge attaches pen register data showing various phone contacts from Hodge's -2000 phone on October 24, 2022 and October 26, 2022, but no phone contacts at all on October 25, 2022.  (ECF 92-4: Attachment to Hodge Mot. to Supp., PageID 485).

From speaking to its DEA case agent, the government's understanding is that there was a lapse in storing or saving pen register data from Hodge's -2000 phone from October 25, 2022, which explains why the pen register data from that day did not appear in the spreadsheet provided to Hodge in discovery.  But the DEA subsequently subpoenaed toll records for Hodge's -2000 phone, which confirmed that there were seven phone contacts between Hodge's -2000 phone and L.D.'s -6130 phone on October 25, 2022.  Those subpoenaed toll records are attached to this response.[7]

---

[7] For brevity, the government only copied the pertinent section from the subpoenaed T-Mobile toll spreadsheet, and highlighted the seven phone contacts between Hodge's -2000 number and L.D.'s -6130 number on October 25, 2022.  The entire spreadsheet of subpoenaed tolls would result in a PDF over 100 pages, which the government believes is unnecessary to file. Nonetheless, if Hodge disputes the authenticity of the attached spreadsheet, the government can file the entire spreadsheet and accompanying documents from T-Mobile on the docket.

Pen register data and toll records both list incoming and outgoing phone contacts over a particular phone number. The main difference is that pen register data is provided in real time pursuant to a court order, whereas toll records are historical and are typically obtained with a subpoena. So the subpoenaed toll information from Hodge's -2000 number reflects the same information that the agents previously saw on pen register when this affidavit was drafted, namely, that Hodge's -2000 phone and L.D.'s -6139 phone had seven contacts on October 25, 2022.

Paragraph 95 therefore contained no false information about the seven phone contacts between Hodge and L.D. on October 25, 2022. Even if it did, it still was not essential to the determination of probable cause to search Hodge's residence and business.

> d.  **Claims 4 through 7: Hodge has failed to show that any of the affidavit's factual statements about the September 19, 2022, suspected drug money transfer between Hodge and Thomas in the Touch of Italy parking lot were false or misleading.**

Paragraphs 44 through 66 of the affidavit describe how on September 19, 2022, Thomas got into Hodge's parked Ford Escape in the Touch of Italy parking lot, in what the affiant believes was a drop-off of drug money that Thomas owed Hodge. (Search Warrant Affidavit, ¶ 44-63). The affiant's belief was supported by surveillance of Thomas getting into and out of Hodge's parked Ford Escape under suspicious circumstances; phone contacts between Hodge and Thomas that started on the evening before (September 18th) and went through the time of thee suspected money transfer; the previous message conversations found on Thomas's phone about meeting Hodge at the Touch of Italy parking lot to conduct a drug money transfer; and the other information in the affidavit about online orders for pill-manufacturing materials and the seizure of similar items from Thomas's two residence on September 28, 2022. *See generally* (*id.*).

47

Hodge raises several complaints about these paragraphs in his motion to suppress, which appear as claims four through seven in his motion.  *See* (ECF 92: Hodge Mot. to Supp., PageID 470-74).  But none of those claims have merit.

First, Hodge claims that Paragraphs 44 and 63 of the affidavit—which describe how Thomas and Hodge had three phone "contacts" at around 11:11 p.m. on September 18, 2022, and the affiant's belief that the two likely met during the earlier morning hours of September 19th for a drug deal—were "false and misleading" because the affiant "did not have one piece of evidence that Sherman Thomas and Melvin Hodge met in the early morning hours of September 19, 2022."  (ECF 92: Hodge Mot. to Supp., PageID 470-71).  This claim fails for several reasons.

For starters, the affidavit set forth multiple facts to support the affiant's conclusion that Thomas and Hodge met in the early morning hours of September 19th to conduct a drug deal. Thomas and Hodge had a series of three phone contacts at approximately 11:11 p.m. on September 18th.  (Search Warrant Affidavit, ¶ 44).  Roughly an hour later, at around 12:22 a.m., the GPS tracker on Thomas's vehicle showed that he drove to an area approximately a half-mile away from Hodge's Omega Avenue business unit in Bedford Heights, and returned back to his Father Caruso Drive apartment in Cleveland at around 1:12 a.m.  (*Id.*, ¶ 45).  Thomas then made the suspected money drop-off in Hodge's Ford Escape at the Touch of Italy parking lot on the afternoon of September 19th, which was corroborated by surveillance, prior text messages, phone contacts, and the affiant's experience.  (*Id.*, ¶ 44-66).  And when law enforcement searched Thomas's Father Caruso Drive apartment nine days later on September 28, 2022, they found large amounts of methamphetamine in crystal and pill form, (*id.*, ¶ 30-32), which corroborated that Thomas brought the drugs purchased from Hodge back to his Father Caruso Drive apartment.  Given the "considerable weight" the magistrate was permitted to give an

experienced affiant's beliefs and opinions, *see Mick*, 263 F.3d at 566, the affiant's conclusion that Thomas and Hodge met for a drug deal in the early morning hours of September 19th was justified, and fully-supported by the facts described in the affidavit.

Also, the affiant never stated that Hodge and Thomas actually met during the early morning hours of September 19, 2022. *See* (*id.*, ¶ 63). Instead, the affiant took care to separate *factual* statements (such as the three phone contacts that occurred between Hodge and Thomas during the late evening hours of September 18, 2022) from *belief* statements (such as the belief that Hodge had provided drugs to Thomas in the early morning hours of September 19, 2022). *See* (*id.*, ¶ 44, 63). This allowed the magistrate judge to evaluate the strength of the affiant's beliefs, without any confusion about what facts supported those beliefs. And notably, Hodge has failed to cite a single case where a court granted a *Franks* hearing based on a defendant's claim that the affiant's *beliefs* or *conclusions* (as opposed to the affidavit's *facts*) were wrong. *C.f. Franks*, 438 U.S. at 155 (explaining that the *Franks* opinion was about "the truthfulness of *factual* statements made in an affidavit supporting [a] warrant") (emphasis added). But regardless, whether or not Hodge and Thomas actually met to exchange drugs in the early morning hours of September 19, 2022 (as opposed to some earlier occasion), is largely immaterial to the probable cause for searching Hodge's residence and business. The important point is the affiant's belief that Thomas left drug money in Hodge's Ford Escape, which Hodge then likely brought back to his Timberline Trail residence. So Hodge's fourth *Franks* claim fails.

Hodge's fifth *Franks* claim asserts that when the affidavit referred to phone "contacts" between Hodge and Thomas in Paragraphs 46 and 48, it "false[ly]" included phone contacts that were listed with a duration of 0:00:00. (ECF 92: Hodge Mot. to Supp., PageID 471-72). This

claim also fails. The government's understanding is that when DEA's pen register system shows a call duration of 0:00:00, that reflects either a missed call or a text message. Hodge assumes—without proffering any evidence—that a call duration of 0:00:00 can *only* refer to a missed call, not a text message. *See* (*id.*). Hodge bears the burden of proving his allegations, and without proffering some evidence to support this assumption, the inquiry can end there. *See Franks*, 438 U.S. 155-56.

But even assuming that a call duration of 0:00:00 on a pen register could *only* mean a missed call, Hodge has still failed to show how the affiant's use of the term "contacts" is in any way false or misleading. The affiant carefully stated that these were "contacts" between *two phones* on September 19, 2022, and not phone conversations that actually took place between *two people*. *See*, *e.g.*, (Search Warrant Affidavit, ¶ 46) ("On September 19, 2022, I reviewed the PEN register and noticed SHERMAN THOMAS' phone (314) 699-1761 was in contact with MELVIN HODGE's phone (602) 596-8899 approximately 21 times between 10:11 A.M. and 1:03 P.M."). Short of listing out every call time and duration in the affidavit (which would become lengthy, and also risk overwhelming the magistrate judge an unnecessary data dump), the government is unsure how those paragraphs could be phrased any more accurately. The affidavit also notes that Thomas and Hodge used other forms of communication, like Apple FaceTime, that might not be captured on a traditional pen register, so the two had other ways of talking to each other. *See* (*id.*, ¶ 66). Hodge's fifth *Franks* claim about the meaning of phone "contacts" therefore fails too.

Hodge's sixth *Franks* claim is directed at Paragraphs 51 through 57 of the affidavit (describing the Touch of Italy meeting and cell phone information about Hodge and Thomas), and involves several short arguments.

50

Hodge first asserts that "there was no communication between [Hodge's -8899 number] and [Thomas's -1761 number] between 13:46:23 and 22:07:37 on September 19, 2022." (ECF 92: Hodge Mot. to Supp., PageID 472). But the pen register data that Hodge attached to his motion confirms that there *were* contacts between those two numbers during that time. *See* (ECF 92-5: Attachment to Hodge Mot., PageID 486) (boxes 725 and 731 show phone contacts in that timeframe).

Hodge next complains about Paragraph 55, which states that "[b]etween 1:03 P.M. and 2:01 P.M., prospective cell site location information for HODGE's phone (602) 596-8899 showed the phone was hitting off a cellular tower in the close vicinity of a Touch of Italy restaurant." (Search Warrant Affidavit, ¶ 55); (ECF 92: Hodge Mot. to Supp., PageID 472). This argument appears to be the same argument raised in Hodge's "Motion to Suppress Cell Site/Location Data for (602) 596-8899" at ECF 90, which claims that the government unlawfully obtained and used cell site data about Hodge's -8899 cell phone. (The government is filing a separate response to that motion.). But Hodge does not assert that any *factual* information in Paragraph 55 was false or misleading. So this cannot be the basis for a *Franks* hearing, which is concerned only with "the truthfulness of *factual* statements made in an affidavit[.]" *Franks*, 438 U.S. at 155 (emphasis added).

Hodge's remaining complaint about Paragraphs 51 through 57 is that "[t]he window tint on the vehicles would have prohibited law enforcement's conclusions that any drug activity occurred that day." (ECF 92: Hodge Mot. to Supp., PageID 472). This argument fails for several reasons. First, the affidavit never stated what Thomas did inside Hodge's parked Ford Escape in the Touch of Italy parking lot on September 19, 2022. Instead, that affidavit described how Thomas got into Hodge's parked Ford Escape while on his phone with Hodge, and then left,

51

eventually returning back to his Father Caruso Drive apartment where large quantities of drugs and related items were seized nine days later on September 28, 2022.  To be clear, the affiant did later state his *belief* that Thomas left drug money inside Hodge's Ford Escape, but the affiant was careful to separate that belief statement from the earlier factual statement, a practice followed throughout the affidavit.  Nonetheless, even if the Escape's window tint had any bearing on the credibility of the factual statements in the affidavit, it is Hodge's burden to produce evidence to support his claim about window tint, which he has not done.  So this argument fails as well.

Hodge's seventh *Franks* claim is that the conclusion about Thomas leaving drug money inside Hodge's parked Ford Escape was a "false and misleading conclusory statement[] . . . not supported by any actual facts in the affidavit."  (ECF 92: Hodge Mot. to Supp., PageID 473-74).  But as discussed above, the affidavit was careful to separate *factual* statements (that Thomas entered Hodge's parked Ford Escape after their series of phone contacts) from *belief* statements (that Thomas left drug money in Hodge's Ford Escape).  Even then, the affiant's belief was supported by a number of facts, including the suspicious circumstances of Thomas getting into Hodge's parked car, the previous messages between the two about transferring drug money at the Touch of Italy restaurant, the phone communications between Thomas and Hodge that day, and Thomas's other drug-related activity during that same timeframe.

For those reasons, Hodge's *Franks* claims about the September 19th Touch of Italy suspected drug money transfer are meritless.

     e.     **Claim 8:  Hodge cannot use a *Franks* hearing to address his claim about the unlawful use of cell site evidence, since that claim is *legal* in nature, and does not involve challenging the truth of any *factual* statements in the affidavit.**

Hodge's eight *Franks* claim is the same one raised in his "Motion to Suppress Cell Site/Location Data for (602) 596-8899" at ECF 90, namely, that the government unlawfully obtained and used cell site data about his -8899 cell phone.  *See* (ECF 92: Hodge Mot. to Supp., PageID 474).  But as discussed above, *Franks* is about "the truthfulness of *factual* statements made in an affidavit supporting [a] warrant[,]" *see Franks*, 438 U.S. at 155, not about other alleged Fourth Amendment violations that are legal in nature.  Hodge does not claim that any of the information about cell site data in the warrant affidavit is false or otherwise misleading.  *See* (ECF 92: Hodge Mot. to Supp., PageID 474).  So to the extent Hodge claims that any cell site information "was unlawfully obtained[,]" that is a legal claim falling outside the scope of *Franks*.

     f.     **Claim 9:  Hodge has failed to meet his burden of showing that the affidavit omitted any information with the intent to mislead the magistrate judge.**

Hodge's ninth and final *Franks* claim is that "the affidavit failed to state relevant information."  (ECF 92: Hodge Mot. to Supp., PageID 475-76).  This claim also fails.  As discussed above, *Franks* is generally "inapplicable to the *omission* of disputed facts" in an affidavit, "except in the very rare cases where the defendant makes a strong preliminary showing that the affiant *with an intention to mislead* excluded critical information from the affidavit." *Mays v. City of Dayton*, 134 F.3d 809, 816 (6th Cir. 1998) (emphasis in original).

Hodge first complains that the affidavit did not include "the simple statement that Melvin Hodge has no history of any such [drug trafficking] conduct."  (ECF 92: Hodge Mot. to Supp., PageID 475).  But Hodge has failed to cite any case holding that an affiant has an affirmative

duty to state whenever a suspect in an investigation has no criminal history.  Notably, in a somewhat analogous context, the Sixth Circuit held that a defendant was not entitled to a *Franks* hearing where the affidavit omitted information about a cooperating individual's "criminal history and lack of a prior relationship as a confidential informant," *United States v. Fisher*, 824 Fed. App'x 347, 354 (6th Cir. 2020), which indicates that the same reasoning would apply to Hodge's lack of a similar criminal record.  Ultimately though, even if Hodge's lack of criminal record were somehow an issue here, the fact that the affiant described the criminal records of other targets in the investigation (such as Thomas and Carvin Cook), but did not identify any criminal record for Hodge, implied that Hodge had no criminal record.  So Hodge has failed to show that this was an omission that warrants a *Franks* hearing.

Hodge's other omission complaint is that the affidavit failed to state that he had "no connection" to some of the people and places at issue in the investigation, including Carvin Cook and Thomas's two residences at 5900 Father Caruso Drive and 2140 Reyburn Road.  (ECF 92: Hodge Mot. to Supp., PageID 475).  This claim, however, ignores many of the paragraphs in the affidavit detailing this connection, including that Thomas retuned back to his Father Caruso Drive residence after appearing to leave drug money in Hodge's parked Ford Escape on September 19, 2022, (Search Warrant Affidavit, ¶ 56), and that the compression binder package Carvin Cook picked up on July 12, 2022 was later found in Thomas's Reyburn Road stash house, (*id.*, ¶ 33).  Hodge has also failed to cite any cases holding that an affiant must affirmatively state every time a suspect is not directly involved in an incident.  Requiring an affiant to do this would result in potentially confusing and wordy affidavits.

For all of those reasons, Hodge has failed to meet his "heavy burden" for obtaining a *Franks* hearing.

**D.** **Even if this Court concludes that the affidavit was deficient, the good faith exception to the exclusionary rule would preclude the suppression of evidence found during the warrants.**

Normally, evidence seized pursuant to an invalid search is suppressed under the exclusionary rule. *See Wong Sun v. United States*, 371 U.S. 471 (1963). But under the good faith exception, evidence "seized in reasonable, good faith reliance on a search warrant that is subsequently held to be defective" is not suppressed. *United States v. Leon*, 468 U.S. 897, 905 (1984). In *Leon*, the Supreme Court identified only four situations where the good-faith exception would not apply to a defective search warrant: (1) where the affidavit contains statements the affiant knew or should have known to be false, (2) where the issuing magistrate wholly abandoned their judicial role, (3) where the warrant is supported by nothing more than a bare bones affidavit, and (4) where the warrant is so facially deficient that the executing officers cannot reasonably presume it to be valid. *Id.*; *see also United States v. Washington*, 380 F.3d 236, 241 (6th Cir. 2004).

Here, aside from claiming that the affidavit contained false or misleading information (addressed above), Hodge has failed to explain why *Leon's* good faith exception would be inapplicable. Hodge does not allege that the magistrate judge wholly abandoned their judicial role, nor does he allege that the warrant was so facially deficient that the executing officers could not have reasonably relied on it.

While Hodge does dispute whether the affidavit set forth probable cause (also addressed above), he does not allege that the affidavit was so bare bones or conclusory "as to render official belief in its existence entirely unreasonable." *Leon*, 468 U.S. at 923. As the Sixth Circuit has explained, those are two separate issues. *See Reed*, 993 F.3d at 451 (explaining that there "must be daylight between the two standards" and that *Leon* good faith requires only "a minimally

sufficient nexus[,]" which means "some connection, regardless of how remote it may have been . . . between the criminal activity at issue and the place to be searched") (quotations and citations omitted); *United States v. Gilbert*, 952 F.3d 759, 763 (6th Cir. 2020) ("We must take care not to confuse a bare bones affidavit with one that merely lacks probable cause.").  Here, the affidavit contained numerous examples of the connection between Hodge's residence and business unit, and the drug activity, which were discussed above.  Thus, even if this Court concludes that the affidavit was deficient, the good faith exception would preclude the suppression of evidence found during the warrants.

The government also notes several other factors that would support applying the good faith exception here (in the event the Court finds the affidavit lacking probable cause).

First, this warrant was presented to the same federal magistrate judge who issued the previous warrants in the investigation, including ping warrants, tracker warrants, warrants to examine seized cell phones, and the warrants to search 2140 Reyburn Road and 5900 Father Caruso Drive.  This is consistent with the criminal duty policy for magistrate judges in the Northern District of Ohio, which typically assigns one magistrate judge per investigation.  *See* NDOH Amended General Order 2011-31-5, Criminal Duty Protocol of Magistrate Judge, ¶ 1 ("Once the CDMJ [criminal duty magistrate judge] issues such a warrant, the CDMJ will review any subsequent, related search warrants or ex parte applications.").  The government's understanding is that this policy promotes efficiency in ongoing or complex investigations (such as this one), by allowing the assigned magistrate judge to become familiar with the nature of the case.  That way, review of subsequent warrants becomes more efficient.  But applied here, the fact that the agents followed this procedure and presented their search warrants to the same federal magistrate judge further supports their good-faith belief that this warrant was valid.

Second, an AUSA reviewed this search warrant affidavit before it was submitted to the magistrate judge, as is the case with every federal search warrant affidavit in the Northern District of Ohio. Although not dispositive, review by a prosecutor is a relevant factor in the good faith analysis. *See, e.g., Leon,* 468 U.S. at n. 4 (applying good-faith exception where officers consulted with three deputy district attorneys before submitting deficient warrants to the court); *United States v. Johnson,* 78 F.3d 1258, 1264 (8th Cir. 1996) (noting that seeking the advice of a district attorney is a factor weighing in favor of determining that the officer's reliance on the warrant was objectively reasonable); *United States v. Tagbering,* 985 F.2d 946, 949-51 (8th Cir. 1993) (applying the good-faith exception where a prosecutor had reviewed and signed the warrant affidavit before it was submitted to the court); *United States v. Brown,* 951 F.2d 999, 1005 (9th Cir. 1991) (noting "an officer's consultation with a government attorney is of significant importance to a finding of good faith").

Ultimately, aside from his *Franks* claims, Hodge has failed to explain why *Leon's* good faith exception would not apply here. So even if this Court concludes that the affidavit lacked probable cause, the good faith exception would preclude the suppression of evidence.

## III.    CONCLUSION

For the foregoing reasons, the Court should deny Hodge's motion to suppress. (ECF 92).

Respectfully submitted,

REBECCA C. LUTZKO
United States Attorney

By:    /s/ James P. Lewis
James P. Lewis (MD: 1412170148)
Assistant United States Attorney
United States Court House
801 West Superior Avenue, Suite 400

Cleveland, OH 44113
(216) 622-3958
(216) 522-7499 (facsimile)
James.Lewis@usdoj.gov